UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL NO. 13-10024-RWZ

UNITED STATES OF AMERICA

v.

MARK J. ZIMNY

FINDINGS AND CONCLUSIONS

July 28, 2017

ZOBEL, S.D.J.

On January 24, 2017, the United States Court of Appeals for the First Circuit remanded the case United States v. Zimny to this court with instructions to conduct further investigation into a juror misconduct allegation raised by defendant. The additional alleged misconduct was described in a comment posted on June 29, 2015, 12:24 am, on the "Shots in the Dark" blog (the "additional comment"). See United States v. Zimny, 846 F.3d 458, 472 (1st Cir. 2017). Specifically, the Court of Appeals directed this court to: (1) ascertain whether the events described in the additional comment actually occurred; (2) if so, determine whether it was prejudicial; and (3) decide whether the information unearthed from the investigation warrants granting defendant a new trial. See id. at 472.

I.  **Background**

As relevant to the instant inquiry, on April 8, 2015, after a thirteen-day trial, a jury found defendant, Mark J. Zimny, guilty of five counts of wire fraud, five counts of

414

engaging in unlawful monetary transactions, two counts of filing false tax returns, and one count of bank fraud. See Docket # 220. Defendant initially moved for a new trial and requested the court to conduct an interrogation of Juror # 8 about potential jury misconduct after learning of a comment posted on the "Shots in the Dark" blog. Docket # 225. This comment, dated April 7, 2015, stated, "It's gone a week longer than the judge has hoped dude [sic] to Lily Chows [sic] testimony. When I left the jury last week due to an illness they were 50/50." Id. at 5. On June 23, 2015, I conducted an inquiry of Juror # 8 and determined that based on her testimony no jury misconduct had occurred. See infra Part II.B. Four days later, on June 29, 2015, a second anonymous comment that is the subject of the current investigation was posted on the same blog. This comment stated:

> Boy this is getting comical. I've been following it on and off, and was also on the jury. Mama June, and those who were there know what I'm talking about, was spouting about the 'shots in the dark' blog since day one. Its [sic] why she conveniently got 'sick' and didn't finish her service. Several other jurors told her to stfu and got annoyed. '[I]diot' doesent [sic] describe the half of it.

Zimny, 846 F.3d at 464. Defendant moved for reconsideration and a new trial in light of this additional comment. Docket # 259. I denied the motion, Docket # 283, which defendant timely appealed, Docket # 301. Pursuant to the remand order of the Court of Appeals, below are the findings and conclusions of the investigation regarding this additional alleged jury misconduct.[1]

---

[1] At the conclusion of the jury investigation, the court ordered both parties to submit their proposed findings and conclusions by July 21, 2017. See Docket # 395, at 66–68. The government submitted its Proposed Remand Hearing Findings on July 22, 2017. Docket # 409. On Friday, July 21, 2017, defendant moved for leave to file documents under seal, without providing the proposed documents. Docket # 408. Nonetheless, the court granted his motion on Monday, July 24, 2017. Docket # 410. As of July 28, 2017, counsel for defendant has not filed those documents for which leave to file

## II.     The Initial Investigation

### A.     Postal Inspector Investigation

Following the remand order, the court convened the parties on February 2, 2017, to discuss the direction of the investigation.  The parties agreed as a first step to task a postal inspector with identifying the author of the comment by identifying the device from which the additional comment was sent.  See Docket # 338, at 15–21.  On March 15, 2017, the government reported the postal inspector's initial findings.  See Docket # 345.  The inspector determined that the comment had an internet protocol address ("IP address") associated with an internet service provider located in Singapore.  See Docket ## 345, 348, 349.

The government reported that trying to obtain the specific IP address user information would be a difficult and lengthy process under the laws of Singapore.[2]  Docket # 352, at 4.  After hearing both parties, the court determined that the search for the author of the additional comment through identification of the IP address user from which the comment was sent was both uncertain and likely time consuming.  See Docket # 352.  Both parties agreed.  See id. at 5–6 ("MR. THOMPSON: I don't oppose the government pursuing the matter [in Singapore] further, but my understanding is that

---

was granted, nor any proposed findings and conclusions of law.

[2]     The government stated that "[i]f [it] were given time to pursue [the Singapore lead] fully and it resulted that the IP address were shown to belong to Mr. Zimny, [the government] would file charges of obstructing justice . . . . [T]he investigation points further and further away from any jurors having written that blog." Docket # 352, at 5. Defendant subsequently filed a motion to preclude further government participation in the remand investigation. Docket # 355. I found that the government's potential pursuit of the Singapore inquiry is a separate matter which the court has no authority to enjoin the government from conducting. Further, the government remains an essential party to the investigation, which would proceed by interrogation of the jurors. Thus, defendant's motion was denied on May 8, 2017. Docket # 360.

3

we're talking about an investigation that might take more than a year, and I don't think that it's appropriate to continue this investigation for that long."); id. at 33 ("MR. WILD: I suggest to the Court, you're correct, the only further record possible to be made at this point, pending some information, is inquiry of the jurors . . . .").

### B.     Decision to Bring Back the Jurors

Consequently, on March 29, 2017, the court decided to move the investigation forward by interrogating all of the jurors, with the exception of Juror # 8, individually to determine the questions raised by the Court of Appeals. See Docket ## 352, 356.

Defendant requested that the court summon Juror # 8 because she "may establish that the additional juror comment reflects events that actually occurred . . . ." Docket # 348, at 2.[3]  I decided that it would be most appropriate to proceed with summoning the other thirteen jurors first for several reasons.  First, I had already questioned Juror # 8 on June 23, 2015, to ask about the initial comment posted on April 7, 2015, and asked her whether she had discussed the blog with any of the jurors and whether the jury had engaged in premature deliberations.  See Docket # 256.  She testified that although she had seen the blog and authored the April 7 comment, she had done so only after she was excused from the jury. Id. at 9–10.  She further testified that she never engaged in premature deliberations with any of the jurors. Id. at 11–15. Second, even if she were now to testify to the contrary and state that she had told the

---

[3]   Defendant also requested that the court summon Richard Bradley, the host of the "Shots in the Dark" blog to inquire "about any knowledge he may have regarding the identity of the author" of the additional comment.  Docket # 348.  There is no evidence in the record, however, that supports such a finding.  In any event, it would not avoid the ultimate task of summoning the jurors for the reasons described above.  Thus, I decided to maintain the direct course of action and to question the alleged source: one of the thirteen jurors.  See Docket # 352, at 16–19.

4

jurors about the blog, the court would still need to interrogate each juror to determine whether the alleged misconduct indeed transpired, and if so, what the jurors had heard and when. Thus, in order to expeditiously conduct the investigation, the court denied defendant's request, but noted that it would call Juror # 8 "if we need to," Docket # 352, after conducting the examination of the other thirteen jurors.[4]

### III. Preparing the Juror Investigation Questions

#### A. Drafting The Script

In response to both counsel's conflicting schedules, the court initially set the juror interrogation to proceed on May 23 and 24, 2017. See Docket # 352, at 44–45. In preparation for the interrogation, the court ordered the parties to submit, by the latter part of April, a joint proposed explanatory letter that would accompany the summons and a joint proposed script for the interrogation. See id. at 46–48. The court intended to issue the summons to the jurors by May 1, 2017. See id. Both parties failed to submit the joint proposed documents by late April.[5] This resulted in delaying the juror inquiry, which was subsequently rescheduled to June 21–23, 2017. The court issued a second order on May 8, 2017, directing the parties to again submit a joint proposed explanatory letter by May 19, 2017, and a joint proposed script by May 26, 2017. See Docket # 360. The parties ultimately made separate submissions, albeit defendant's

---

[4] As discussed below, the determination of whether any juror misconduct occurred has been sufficiently addressed by the testimony of the other thirteen jurors. Thus, I find no need to summon back Juror # 8 for further questioning.

[5] On May 3, 2017, defendant's counsel submitted a separate proposed explanatory letter. See Docket ## 357, 358. In response to an email from the courtroom deputy clerk reiterating to the parties to file a joint notice, defense counsel explained that he could not submit joint papers in light of the government's "criminal investigation of Mr. Zimny," and had moved to preclude further government participation in the remand investigation. See May 1, 2017, email correspondence included herein as "Attachment A." This motion was denied. See discussion supra note 2.

5

was untimely.  See Docket ## 373, 375.

The court convened the parties on May 31, 2017, "to receive counsels' suggestions, objections, and arguments concerning the conduct of the interrogation of the jurors . . . ."  Docket # 379, at 1.  Based on counsel's input during this hearing, the court issued its Juror Investigation Script and ordered the parties to provide reasonable and appropriate suggestions by June 12, 2012.  See Docket # 382.  The government timely provided its proposals, Docket # 384; defendant submitted his proposals on June 13, 2017, Docket # 387.[6]

On June 20, 2017, the day prior to the examinations, defendant submitted two additional proposals to the juror script.  See Docket # 389.  The first proposal was to ask the jurors whether they had heard of the "Shots in the Dark" blog under the heading of the "Harvard Admissions Lawsuit" to avoid missing affirmative responses from jurors who may be familiar only with the latter title.  The court adopted this proposal.  The second proposal related to jurors' potential connections with Singapore.  At the hearing, the court explained that its questions about international travel accounted for this concern.  See Docket # 393, at 7.

### B.     The Script

In its final version of the script, the court adopted defendant's request to advise the jurors, out of an abundance of caution, of their Fifth Amendment right not to

---

[6] Defendant's counsel represented to the courtroom deputy clerk that he had not received the sealed June 9, 2017 order.  See June 13, 2017 email correspondence attached herein as "Attachment B".  After being provided with a time-stamped notice that reflected the court's order was sent to counsel on June 9, 2017, at 3:57 p.m., defense counsel wrote: "Rechecking my email records I learned that I was mistaken; your email was delivered on June 9. I apologize." Id.  Defendant states that his submission was in response to "the Court's December 9, 2017, Order." Docket # 387.  This appears to be a typographical error because the court's order was dated June 9, 2017, Docket # 382, and there are no orders dated December 9 of any year in this case.

incriminate themselves and to remain silent. In compliance with Federal Rule of Evidence 606(b), the court further advised each juror that it would not ask him or her about the jury's deliberative processes. The court tailored its questions to ensure that it would not ask any subjective questions. The script was limited to questions about whether the jurors had heard of the "Shots in the Dark" or "Harvard Admissions Lawsuit" blog, and whether the events described in the additional comment had transpired. As noted above, the initial findings by the postal inspector uncovered that the comment had an IP address associated with a company located in Singapore. Accordingly, the court included questions about jurors' travel after their service was completed.

## IV. Juror Questioning

The summoned jurors all appeared for interrogation. They were questioned individually over the course of three mornings. The jury clerk impeccably carried out the logistics such that jurors were isolated from one another prior to and after each appeared. The court questioned each juror consistent with the script that had been developed with counsel's input. After the court completed its questions, both parties' had the opportunity to submit additional proposed questions to the court, some of which the court put to the juror.

I credit the testimony of each juror and, based on that testimony, find as follows:[7]

### A. None of the Jurors Had Seen the June 29, 2015, Comment

Each juror was shown a copy of the additional comment, which had been

---

[7] For organizational purposes, in the citations, I refer to the jurors by number rather than by name. A list of each juror's name is included following these findings and conclusion as "Attachment C."

marked as "Exhibit A," and was asked if he or she had ever seen it before. The jurors were unanimous in their testimony that none had seen this comment until it was presented during the court's questioning. See Docket # 395, at 20 (Juror # 1); Docket # 393, at 21 (Juror # 2); Docket # 395, at 8, 10 (Juror # 3); Docket # 393, at 12–13 (Juror # 4); Docket # 393, at 29 (Juror # 5); Docket # 393, at 40 (Juror # 6); Docket # 395, at 39 (Juror # 7); Docket # 395, at 56 (Juror # 9); Docket # 394, at 27 (Juror # 10); Docket # 395, at 48 (Juror # 11); Docket # 394, at 19 (Juror # 12); Docket # 395, at 30–31 (Juror # 13); Docket # 394, at 11 (Juror # 14). Accordingly, I find that none of the jurors had seen the additional comment.

Further, each juror was asked whether he or she had ever heard of the "Shots in the Dark" or "Harvard Admissions Lawsuit" blog. Only one of the jurors potentially did. Compare Docket # 395, at 17–19 (Juror # 1), with Docket # 393, at 21 (Juror # 2); Docket # 395, at 10 (Juror # 3); Docket # 393, at 12 (Juror # 4); Docket # 393, at 29 (Juror # 5); Docket # 393, at 40 (Juror # 6); Docket # 395, at 39 (Juror # 7); Docket # 395, at 56 (Juror # 9); Docket # 394, at 27 (Juror # 10); Docket # 395, at 48 (Juror # 11); Docket # 394, at 19 (Juror # 12); Docket # 395, at 30 (Juror # 13); Docket # 394, at 11 (Juror # 14). This juror, Juror # 1, encountered the blog for the first time after the trial, and he did not go on the blog during the time the additional comment was written. Specifically, Juror # 1 testified that about one or two days after the trial concluded, he conducted an internet search that led him to a blog. Docket # 395, at 17–18. He said that this was the first time he saw the blog, and he did not recall the name of the blog. Id. It appears from his testimony that he saw Juror # 8's comments. When explaining what he saw on the blog, Juror # 1 (Carroll Gustafson) testified:

8

>    MR. GUSTAFSON: I learned that people who followed these sorts of — follow trials had an opinion about how the verdict should go and that the verdict was — the verdict that was handed down came out according to their — or the decision that — more clearly, that the decision that the jury came to was in keeping with the way they thought these people — whoever posted the blog post thought the jury should decide.
>    THE COURT: Was there in this document that you saw or this report any mention of things that happened in the jury room?
>    MR. GUSTAFSON: Yes.
>    THE COURT: And what did that blog, whatever it was, say about that?
>    MR. GUSTAFSON: That there was a juror that was absent that had — there was a juror that was not able to continue on the trial.
>    THE COURT: And was that, from your recollection of what happened during the trial, an accurate statement?
>    MR. GUSTAFSON: Yes, it was.
>    THE COURT: What else did you learn from the blog that represented — about what the jury did or didn't do during this trial?
>    MR. GUSTAFSON: I don't recall about what the jury did or didn't do, but that there were a certain number of counts and that either the poster of the blog post or those in the comments knew what the jury's decision was on those counts.
>    THE COURT: Was there any reference to Mama June?
>    MR. GUSTAFSON: Not that I recall.
>    THE COURT: Was there any discussion in the jury room at any time about a Mama June?
>    MR. GUSTAFSON: Was there a —
>    THE COURT: Did any of the jurors at any time during the trial and before deliberations talk about Mama June?
>    MR. GUSTAFSON: No, they did not. I would have definitely remembered Mama June. I'm sorry.

Docket # 395, at 18–20. Juror # 1 further testified that he had not seen the additional comment, nor was he aware of the contents of the additional comment. Id. at 19–20. In response to defendant's supplemental proposed questions, Juror # 1 testified that he never went back to the blog after reading it shortly after the trial, and he did not post any comments to it. Id. at 23. I credit Juror # 1's testimony and find that Juror # 1 encountered the April 7, 2015, comments shortly after the trial concluded on April 8, 2015. I find, however, that he did not see the blog during the trial, nor did he at any

9

point see the additional comment.

At the end of the third morning of examinations, counsel for the defendant suggested that Juror # 11 had seen the blog and that Juror # 11 did not testify truthfully on this issue. See Docket # 395, at 68–72. Juror # 11 had testified that about a week or two after the trial, she "did find out that someone accused the jury of talking about the case in the jury room," and that she "was very appalled at that." Docket # 395, at 45. She said that such discussions did not occur and that the jury "talked about things that happened in other cases. . . . That's the kind of talk that was done in the jury room." Id. at 46. When later asked about her response to the allegation that the jury had engaged in premature deliberations, Juror # 11 responded, "It infuriated me. You know, that's — that's our credibility, and that was not true and it was not the case." Id. at 51. Juror # 11 testified that she didn't "remember anything about a blog"; rather, she learned that a woman on the jury "was claiming that [the jury was] talking about the case and that [it] had already decided the guilt or innocence" from "one of the newspaper people." Id. After Juror # 11 was excused, counsel for the defendant stated:

> I would just like to point out — I would like to make my record here, that this is a juror who — this is clearly a reference to Juror No. 8, Crystal Jean Glass. I did not see it covered that way anywhere except the Shots In The Dark blog
> . . . .

Id. at 52.[8] Following the hearing, defendant's counsel again represented that Juror # 11

---

[8] Counsel for the defendant then continued, "and our inability to ask follow-up questions in order to probe this juror's memory and her credibility has really prevented us from being able to make our record in this case." Docket # 395, at 52. In the case of Juror # 11, this court asked (though not verbatim) four of the six proposed additional questions defense counsel submitted. Compare Defendant's Exhibit 12, with Docket # 395, at 50–51. The fifth and sixth proposed question, "Where did you see the comment about discussions in the jury room?" and "Did someone leave the jury before deliberations began?" were

10

(Jacqueline Straub) must have learned about Juror # 8's blog post from reading the blog:

> Judge, Ms. Straub testified that she learned online that the jury had been — had been accused of improper premature deliberations. Yet, she denied that she had seen the Shots In The Dark blog. She claimed that she got this information from newspaper articles. That we think we can — we want to be able to submit documentation that that is not true, that the information that she attributed to the woman who left the jury — that's what she said in her testimony — that the woman who left the jury was the one who accused the jury of premature deliberations.
> That information was available for the first time on April 7th, 2015, when it was posted on the blog. That detail that it was premature deliberations was not public until May 19th, 2015, when Mr. Zimny's motion for new trial was filed, and it was only available on Pacer at that point, and we don't believe that it was ever reported in a newspaper report.
> We think that her testimony shows that she was on the blog either during the trial or afterward, probably during the trial, and that she did not testify truthfully here.

Id. at 68–69. Counsel repeated this argument, affirmatively stating that the information in Juror # 8's April 7, 2015, comment "was available April 7th while the case was still being tried, and it was not posted anywhere else until May 19th, when the defendant's motion for new trial was filed and a printout of that conversation was attached to that motion as Exhibit A." Id. at 72.

Contrary to counsel's representations, however, a Boston Globe article, published within two days after the trial concluded described Juror # 8's April 7, 2015, comment. This article included:

> Toward the end of the trial, attorneys discovered that someone claiming to be a juror in the case posted anonymously on a blog that jurors had already discussed their thoughts about Zimny's guilt. It is forbidden for juries to

---

not asked explicitly, but Juror # 11 answered them when she testified that "one of the newspaper people said, that there was a woman on the jury, which was the one who left the jury," Docket # 395, at 51. With regard to the other jurors, this court asked defendant's questions when the court found they were relevant to the inquiry at hand.

11

>discuss a case before they are instructed to deliberate at the end of a trial. On the blog, an anonymous commenter wrote on April 7, "When I left the jury last week due to an illness they were 50/50."

Laura Krantz, <u>Admission consultant found guilty of scamming Hong Kong couple</u>, Bos. Globe, Apr. 10, 2015, https://www.bostonglobe.com/metro/2015/04/09/admission-consultant-found-guilty-scamming-hong-kong-couple/wCzExACEZrcGK0esJwcZEN/story.html.[9]

I credit Juror # 11's testimony that she learned about the allegation of premature deliberations from a newspaper article, that she had not heard of or been exposed to the blog, and that the jurors did not engage in premature deliberations.

### B.    None of the Jurors Authored the Additional Comment

Based on the above testimony, I find that the author of the comment was not a juror. In addition, each juror was specifically asked about travels each may have undertaken since the conclusion of the trial. All of the jurors testified either that they had not left the United States or that if they did leave the United States, they went to a country that was not in Asia. See Docket # 395, at 21 (Juror # 1); Docket # 393, at 22 (Juror # 2); Docket # 395, at 12 (Juror # 3); Docket # 393, at 14 (Juror # 4); Docket # 393, at 30 (Juror # 5); Docket # 393, at 41 (Juror # 6); Docket # 395, at 40–41 (Juror #

---

[9]    The government apprised defense counsel and the court of this article through an email sent later in the day of the hearing, and, on July 18, 2017, submitted a proposed remand exhibit including the Boston Globe article, which defendant opposed. See Docket ## 402, 403. In his opposition, defendant stated that the article "is neither relevant not [sic] material to the jury misconduct investigation as conducted by this court." Docket # 403, at 1. While the content of the article may not be relevant to uncovering the ultimate question about the alleged juror misconduct, the existence of the article is relevant to the representations made by defense counsel at the hearing. Specifically, defense counsel attacked Juror # 11's credibility based on assertions that this juror could not have learned about the blog other than from the blog itself. The existence of the article undermines these assertions. In any event, the court takes judicial notice of the article's existence, without regard to the veracity of its contents. Cf. <u>Humphrey v. Comoletti</u>, No. 1:15-cv-14170-ADB, 2017 WL 1224539, at *9 n.7 (D. Mass. Mar. 31, 2017).

7); Docket # 395, at 58–59 (Juror # 9); Docket # 394, at 30 (Juror # 10); Docket # 395, at 50 (Juror # 11); Docket # 394, at 21 (Juror # 12); Docket # 395, at 32–33 (Juror # 13); Docket # 394, at 12 (Juror # 14). Although certainly not dispositive of the issue, to the extent the comment originated from Singapore, this testimony is consistent with my conclusion that the author of the comment was not a juror.

### C. There is No Evidence that Juror # 8 Had Discussed the Shots in the Dark Blog

The jurors were each asked whether they were aware of the events described in the additional comment. Most jurors stated that they were not familiar with the events described. See Docket # 395, at 8, 10–11 (Juror # 3); Docket # 393, at 29–30 (Juror # 5); Docket # 393, at 40–41 (Juror # 6); Docket # 395, at 39–40 (Juror # 7); Docket # 395, at 56–57 (Juror # 9); Docket # 395, at 48–49 (Juror # 11); Docket # 394, at 19–20 (Juror # 12); Docket # 395, at 30–31 (Juror # 13); Docket # 394, at 11–12 (Juror # 14).

To the extent jurors were aware of the comment's content, it was generally that they recalled a juror being sick. See Docket # 395, at 20 (Juror # 1 testified that he "didn't communicate much with the juror who got sick, whether or not she was sick in quotes or sick in actuality. I didn't communicate with her."); Docket # 393, at 21 (Juror # 2 testified, "The only thing I remember is one of the jurors got sick, I believe, a couple of times or cancelled one day or couldn't get here, or something."); Docket # 393, at 13 (Juror # 4 testified, "I knew one person was sick a couple of times, but I didn't know anything else about that. Because she didn't show up, I knew she was sick."). One juror remembered that a juror was dismissed. See Docket # 394, at 28 (Juror # 10 testified, "I'm assuming this is related to the juror who got dismissed, but I — I don't

recall her talking about it ever.").

Juror # 4 testified that she "remember[ed] hearing somebody saying there was something online," but she "didn't hear what it was about, or anything. [She doesn't] think they said what it was about." Docket # 393, at 14. Juror # 4 did not recall who had made the comment. Id. Defendant's counsel submitted follow-up questions about what Juror # 4 (Jean MacLennan) had heard, two of which the court in turn asked:

> THE COURT: Ms. MacLennan, I think you said something about hearing somebody speak about something being posted?
> MS. MacLENNAN: I did hear somebody say that something was posted. I didn't say what, or whatever.
> THE COURT: Do you remember who said that?
> MS. MacLENNAN: No, no, I don't remember. I don't remember anyone's name.
> THE COURT: Do you remember what that comment was?
> MS. MacLENNAN: Just that there was something posted on a blog.
> THE COURT: Okay.
> MR. WILD: Your Honor, before the answer was "online," now it's "blog." I'm wondering if they're the same thing or what the witness recalls.
> MS. MacLENNAN: I don't know whether it was online or a blog. I use them kind of interchangeably.

Id. at 15–16. This was the only juror who had any such recollection. Considering the testimony from all of the jurors from the three days of examination, together with the facts that Juror # 4 had no familiarity with the contents of the additional comment other than a juror being sick, that this juror had no familiarity with the Shots in the Dark blog, and that no other juror had any similar recollection of there being a discussion of anything online, I find that Juror # 4's testimony does not indicate that any of the jurors had discussed the Shots in the Dark blog.

### V. Conclusion

To be sure, the content of the additional comment suggests it may have been

14

authored by someone familiar with the trial.  See Zimny, 846 F.3d at 467–68. Specifically, the author of the comment seemed to be familiar with Juror # 8's appearance and her departure from the jury.  Id.  However, the evidence does not support a finding that the author was a member of the jury.

Based on the credible testimony of the jurors, I find that no misconduct occurred: (1) the author of the additional comment was not a juror, (2) Juror # 8 was not "spouting about" the Shots in the Dark blog; and (3) the thirteen jurors were not exposed to the Shots in the Dark blog during their service.  Accordingly, a new trial is not warranted.

_July 28, 2017_
DATE

_/s/ Rya W. Zobel_
RYA W. ZOBEL
SENIOR UNITED STATES DISTRICT JUDGE